UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARIO REYES, JR., | ) | 1:02-CV-06207 LJO NEW (DLB) HC |
| | ) | |
| Petitioner, | ) | ORDER DENYING MOTION FOR |
| | ) | EVIDENTIARY HEARING |
| v. | ) | [Doc. # 96] |
| | ) | |
| | ) | FINDINGS AND RECOMMENDATION |
| JAMES A. YATES, Warden, | ) | REGARDING AMENDED PETITION FOR |
| | ) | WRIT OF HABEAS CORPUS |
| Respondent. | ) | [Doc. #43] |
| | ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent, JAMES A. YATES[1], is represented in this action by R. Todd Marshall, Esq., of the Office of the Attorney General.

**PROCEDURAL BACKGROUND - STATE COURT**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on May 18, 2000, of one count of first degree murder during the commission of a robbery in violation of Cal. Penal Code § 190.2(a)(17)(A). (CT[2] 493-495.) The special circumstance allegation

---

[1] James A. Yates is the current warden of Pleasant Valley State Prison. James A. Yates is herein substituted for Joe McGrath, the former warden, pursuant to Rule 25, Federal Rules of Civil Procedure.

[2] "CT" refers to the Clerk's Transcript on Appeal lodged contemporaneously with the filing of Respondent's Answer.

1   that Petitioner personally used a firearm during the commission of the offense was found to be true.
2   Id. In addition, the court found that Petitioner had served three prior prison terms within the meaning
3   of Cal. Penal Code § 667.5(a). (CT 727-28.) On June 16, 2000, Petitioner was sentenced to serve an
4   indeterminate term of life without the possibility of parole in state prison. Id. In addition, Petitioner
5   was sentenced to a determinate term of 18 years for the findings that he had personally used a
6   firearm and had previously served three prison sentences. Id.

7   Petitioner thereafter appealed the conviction. On May 24, 2002, the California Court of
Appeals, Fifth Appellate District (hereinafter "5th DCA"), affirmed the conviction. See Exhibit A,
Respondent's Motion to Dismiss (hereinafter "Motion").

10  On June 24, 2002, Petitioner filed a petition for review with the California Supreme Court.
11  See Exhibit B, Motion. On August 14, 2002, the petition for review was denied. See Exhibit C,
12  Motion.

13  On November 21, 2003, Petitioner filed a petition for writ of habeas corpus in Kern County
14  Superior Court. The petition was denied on December 4, 2003. On December 24, 2003, Petitioner
15  filed a petition for writ of habeas corpus in the 5th DCA. On May 28, 2004, the petition was denied.
16  On June 17, 2004, Petitioner filed a petition for writ of habeas corpus in the California Supreme
17  Court. See Attachment A, Answer. On June 8, 2005, the petition was denied. Id.

18  **PROCEDURAL BACKGROUND - FEDERAL COURT**

19  On September 23, 2002, Petitioner filed a petition for writ of habeas corpus in the United
20  States District Court for the Eastern District of California, Sacramento Division. By order of the
21  Court dated October 1, 2002, the action was transferred to the Fresno Division and received in this
22  Court. On October 11, 2002, this Court conducted a preliminary review of the petition, found the
23  petition to be completely deficient, and ordered Petitioner to file an amended petition.

24  On November 1, 2002, Petitioner filed a first amended petition for writ of habeas corpus.
25  Petitioner raised thirteen grounds for relief: 1) "Petitioner was improperly convicted on the basis of
26  uncorroborated accomplice testimony and unreliable extrajudicial accomplice statements"; 2) "The
27  robbery-murder special circumstance must be stricken, because there is no evidence apart from
28  accomplice testimony and statements to establish that allegation"; 3) "The misleading instructions

and prosecutorial comments regarding accomplice corroboration and credibility must be remedied by reversing the judgment"; 4) "The Court improperly admitted the tape of Karina's and Valerie's jailhouse conversation"; 5) "The injection of inadmissible multiple hearsay and irrelevant statements of an accomplice mental state into Petitioner's trial must be remedied by reversing the judgment"; 6) "The erroneous exclusion of impeachment of Robert Castilleja must be remedied by reversing the judgment"; 7) "The improper exclusion of exculpatory defense evidence must be remedied by reversing the judgment"; 8) "The felony murder special circumstance is unconstitutionally overboard [sic]"; 9) "CALJIC No. 17.41.1 improperly chills the jurors' deliberative process"; 10) "The trial errors were cumulatively prejudicial"; 11) "The application of Section 2933.1 restriction of pre-sentencing credit to (15) percent was unauthorized"; 12) "The abstract of judgment must be corrected to remedy a scrivener's error"; and 13) "The Court should have ordered the direct restitution order to be a joint and several obligation."

On November 21, 2002, the Court issued a Findings and Recommendation regarding the amended petition. The Court recommended that Grounds Five, Eight, Nine, Ten, Eleven, Twelve, and Thirteen of the petition be dismissed without leave to amend for failure to state a claim. On April 1, 2003, the District Court adopted the Findings and Recommendation and dismissed the above-referenced claims.

On May 1, 2003, Petitioner filed a notice of appeal of the District Court's order dismissing grounds from his petition. On May 14, 2003, the record was transmitted to the Ninth Circuit Court of Appeals. On August 19, 2003, the Ninth Circuit reversed the District Court's order and remanded the case to allow Petitioner a second opportunity to amend his § 2254 petition.

On September 2, 2003, Respondent filed a motion for panel rehearing and rehearing en banc. The Ninth Circuit construed the motion as a motion for reconsideration. On November 20, 2003, the Ninth Circuit denied the motion.

On December 12, 2003, the Court granted Petitioner leave to file an amended petition pursuant to the Ninth Circuit's decision.

On January 8, 2004, Petitioner filed an amended petition. The Court reviewed the amended petition and on January 13, 2004, ordered Respondent to file a response.

Then, on January 27, 2004, Petitioner filed another amended petition. The petition raised the following ten claims: 1) "Petitioner was improperly convicted on the basis of uncorroborated accomplice testimony which violated the petitioner's due process rights"; 2) "The robbery-murder special circumstance must be stricken, because there is no evidence apart from accomplice testimony and statements to establish that allegation"; 3) "The misleading instructions and prosecutorial comments regarding accomplice corroboration and credibility must be remedied by reversing the judgment"; 4) "The Court improperly admitted the tape of Karina's and Valerie's jail-house conversation"; 5) "The erroneous exclusion of impeachment of Robert Castilleja must be remedied by reversing the judgment"; 6) "The exclusion of exculpatory defense evidence was prejudicial and violated the petitioner's Sixth and Fourteenth Amendment Constitutional rights; therefore, resulting in a fundamentally unfair trial. The improper exclusion of exculpatory defense must be remedied by reversing the judgment"; 7) "The petitioner received ineffective assistance of counsel during his trial, violating Petitioner's Sixth and Fourteenth Amendment Rights and this made the petitioner's trial fundamentally unfair"; 8) "The felony-murder circumstance is unconstitutionally overboard [sic]"; 9) "The trial errors had a cumulative effect that are prejudicial and resulted in unfair trial"; 10) "The Court should have ordered the direct restitution order to be joint and several obligation."

On February 2, 2004, the Court issued an order disregarding the January 8, 2004, amended petition; it was determined that the application for writ of habeas corpus would proceed on the January 27, 2004, amended petition. Also on February 2, 2004, the Court issued a Findings and Recommendation that recommended Ground Seven of the amended petition be dismissed for untimeliness. On March 3, 2004, Petitioner filed objections. On March 16, 2004, the District Court adopted this Court's Findings and Recommendation and ordered Ground Seven dismissed from the amended petition. The matter was referred back to this Court.

On March 29, 2004, the Court issued an order directing Respondent to file a response.

On April 12, 2004, Petitioner filed a motion for reconsideration, a motion for certificate of appealability, and a notice of appeal to the Ninth Circuit Court of Appeals. On April 19, 2004, the District Court denied the motion for reconsideration and motion for certificate of appealability. On May 27, 2004, the Ninth Circuit Court of Appeals denied the request for certificate of appealability

and all pending motions.

On June 14, 2004, Respondent filed a motion for summary dismissal of the petition for failure to exhaust state remedies and for failure to raise cognizable federal claims. Petitioner filed an opposition on July 19, 2004. On August 18, 2004, the Court issued a Findings and Recommendation which recommended: 1) Respondent's motion to dismiss be granted; 2) the amended petition be dismissed for failure to exhaust state remedies with respect to Grounds Two, Six, Nine, and all allegations of prosecutorial misconduct and ineffective assistance of counsel; 3) Grounds One, Three, Four and Ten be dismissed with prejudice for failure to state a cognizable federal claim; and 4) Petitioner be granted leave to file an amended petition deleting the unexhausted claims or a motion to strike the unexhausted claims. On September 20, 2004, Petitioner filed objections. On September 29, 2004, the District Court adopted the Findings and Recommendation in full.

Petitioner filed a notice of appeal to the Ninth Circuit and petitioned for certificate of appealability. On December 17, 2004, the District Court denied the petition for certificate of appealability. On April 22, 2005, the Ninth Circuit denied Petitioner's request for certificate of appealability.

On June 2, 2005, the Magistrate Judge issued a subsequent Findings and Recommendation which recommended dismissal of the entire action for Petitioner's failure to file an amended petition or a motion to delete the unexhausted claims. On June 9, 2005, Petitioner filed objections wherein Petitioner requested the unexhausted claims be deleted in lieu of suffering dismissal. On June 22, 2005, the Magistrate Judge issued an order vacating the Findings and Recommendation and granting Petitioner's motion to delete the unexhausted claims. As a result, the remaining claims in the petition are as follows: 1) "The erroneous exclusion of impeachment of Robert Castilleja must be remedied by reversing the judgment"; and 2) "The felony-murder circumstance is unconstitutionally overboard [sic]." Respondent was then ordered to file a response.

On September 2, 2005, Respondent filed a response. Petitioner filed his traverse on December 5, 2005. Petitioner filed a motion for evidentiary hearing on March 21, 2007, and Respondent filed a memorandum in opposition on April 4, 2007.

## FACTUAL BACKGROUND

The Court hereby adopts the factual summary of the case as set forth by the 5th DCA in its opinion of May 24, 2002:

> The key witnesses against defendant, Gilbert, Valerie, Karina and Robert, were all members of the Castilleja family. The other main prosecution witness, Lisa Balderama, was Robert's cohabitant girlfriend.[3] Defendant and Lisa had been friends since they were children. She introduced defendant to Robert and his nieces and nephews in July 1997.
>
> Robert testified against defendant in exchange for an agreement that he would be permitted to plead guilty to manslaughter for his role in Pugh's murder. Valerie and Karina testified against defendant in exchange for an agreement that they would be permitted to plead guilty to being accessories after the fact to Pugh's murder. Neither Gilbert nor Lisa was charged with any crime related to the murder.
>
> **I. The murder**
>
> Pugh owned his own business and lived in a comfortable house with a backyard swimming pool. For a short time during the early summer of 1997, Pugh allowed Karina, Valerie and Gilbert to live with him. In early July, Gilbert and the girls moved into the apartment Robert and Lisa shared (the apartment).
>
> On the afternoon of July 14, 1997, Lisa Conrad, her sister, and their children spent the afternoon at Pugh's house. Before they left, Conrad cleaned the house. At about 7:00 p.m., she returned the house keys to Pugh at his business.
>
> At around 8:00 p.m. Pugh left his business and went to pick up Jessica Prieto.
>
> At approximately 8:25 p.m., a call was placed to Pugh's home from a pay telephone at a convenience market not far from the apartment.
>
> Pugh and Prieto returned to Pugh's house, where they remained until he drove her home shortly before 10:00 p.m.
>
> At 9:59 p.m., another call was placed to Pugh's house from a pay telephone near the apartment.
>
> Emergency dispatch worker Gina Farnsworth received a call from Pugh at 10:01 p.m. He told her that he had been shot by "a robber" in his home and was dying.
>
> Police officers quickly responded and discovered Pugh lying in the doorway of his home. He had been shot once in the back. Pugh was still conscious and he told Sergeant William Maxwell that he had been shot by "some Mexican." He told the paramedic that an intruder had shot him.

---

[3] Gilbert and Valerie Castilleja are siblings. Karina Castilleja Reimer is their cousin. Robert Castilleja is an uncle to Gilbert, Valerie and Karina. Karina and Valerie were 15 years old during the summer of 1997; Gilbert was 13 years old. Karina married during the interval between Pugh's murder and her arrest. In consequence, she was addressed at trial as Karina Reimer.

For ease of reading, all witnesses except members of the Castilleja family and Lisa Balderama will be referred to by their last names. Also, Karina and Valerie collectively will be referred to as "the girls."

At 11:03 p.m., another call was placed to Pugh's house from a pay telephone near the apartment.

Pugh died at 12:15 a.m. on July 15, 1997. A .22-caliber bullet was removed from Pugh's body. The bullet was probably fired from a revolver.

Pugh had $1.55 in change in his clothing at the time of his death. Pugh's wallet was found in the glove compartment of his car. The investigating detective, Dennis McBride, does not believe there was any cash in the wallet when he found it.

Pieces of a latex glove were found on the den floor and in the kitchen. A plain dark blue or black baseball cap was found on a cabinet in the den. Conrad testified that Pugh never wore baseball caps and she did not see any latex gloves or hats when she cleaned the house on July 14. None of the emergency personnel or investigating authorities left latex gloves in the house.

Blood samples collected at the scene were consistent with Pugh's blood type. Defendant and Robert were excluded as the source of the blood. Latent fingerprints were matched to Prieto. None of the latent prints was matched to defendant.

**II. The investigation**

Detective McBride soon learned that the girls had lived with Pugh shortly before his death and so he interviewed them. Both girls denied possessing any information about the murder. Detective McBride did not interview Robert, Lisa or Gilbert in 1997 and the case remained open.

In 1999, Detective McBride obtained Robert's current address. On September 9, 1999, Detective McBride and his partner Detective Martin went to interview Robert. Lisa Balderama walked out of the bathroom. They took Robert outside to interview him. He denied any knowledge concerning Pugh's murder and left to go pick up his children. Lisa was then interviewed. When Detective McBride told her they were investigating Pugh's murder, Lisa "replied that she was aware that Mario had killed Pugh because he was sleeping with Karina and Valerie." She then provided the detectives with defendant's last name. Until this point, defendant's name had never been mentioned in connection with the investigation. Lisa told the detectives that the girls told defendant that Pugh had raped them. Lisa was angry with them for doing so "because she knew that [defendant] was the type of individual that would actually kill Rod Pugh for what he had done." She also told the detectives that she had seen defendant with a black gun on the night Pugh was killed.

In a second interview conducted on September 13, Lisa told the detectives that on the evening following the murder defendant had come over to their apartment. Robert told her that he thought defendant had killed Pugh. She yelled at defendant and he denied killing Pugh. Defendant and Robert then went outside. Robert came back inside and told her that she was not supposed to know who had killed Pugh. The girls were watching news coverage of the murder on television that evening. Lisa told them that if defendant "ever got in trouble for this, she would . . . beat the shit out of them."

On September 10, 1999, Valerie and Karina were arrested. At that time, Valerie spontaneously stated that she did not know why she was being arrested because "[t]his is on Karina and Mario, I didn't kill nobody."

The girls were placed in a room together and their conversation was surreptitiously tape-recorded. During the course of their rambling conversation, they discussed the murder

and events leading up to it. Valerie said that Robert had driven defendant to Pugh's house and then taken him back to the apartment. She also said that she saw defendant fire a gun through a fence prior to the murder. Defendant said that he would use this gun to kill Pugh. Karina said that defendant told her he had another gun. Valerie said that they were supposed to meet defendant at a store and that they would all go to Pugh's house and kill him. While they were walking to the store, they changed their minds. They telephoned Pugh's house to warn him but Pugh was not home. They saw the ambulance and knew they were too late. Karina said that after stopping at the store, they went back to the apartment. Defendant was there and "they told us that he came covered in blood. That's when we asked him, what happened, and remember he told us that he had to struggle with Rod, he waited for Rod to come." Valerie was uncertain, stating that she thought defendant had told them about the murder "over the phone." The girls recalled that defendant gave them some money the next day and that he had asked Karina to go out to dinner with him. Karina also said that Pugh paid them money to sleep with them but that "it was still rape no matter what." She also said that defendant "did it for a robbery. But because we told him that Rod raped us that's why." Valerie replied, "He needed an excuse for it." A few days after the murder defendant met Karina at "the school" and defendant told her that "he was going out of town because he didn't wanna get caught."

Detective McBride subsequently reinterviewed Karina and Valerie. Karina told him that defendant met them after the murder and gave each of them $20. He told them that he had taken $80 from Pugh's wallet and was splitting it with them.

### III. Trial - prosecution evidence

Gilbert testified that about three days before Pugh was killed defendant came over to the apartment and tattooed Valerie, Karina, Robert, Lisa and him. On a subsequent occasion defendant came over and shot a handgun into a fence near the apartment. On the night Pugh was killed, he saw Robert, Lisa and defendant getting ready to leave in Robert's truck. Defendant was wearing a hat; Robert was not. It was not yet dark. Gilbert asked to go along but Robert told him no. About five minutes after they drove off, Gilbert left with the girls to walk to a convenience store. After they got to the store, they saw an ambulance. The girls started crying. "[T]hey were saying it was too late, it is too late." They got a ride back to the apartment. He did not see defendant when they returned.

Robert testified that he allowed the girls to stay with him for a few weeks in July 1997 because they did not have a place to live. He learned of Pugh's alleged sexual contact with the girls from Karina's brother, Juan. However, he never discussed the alleged incident with the girls prior to Pugh's murder. On the evening of July 14, Robert and Lisa picked defendant up at his residence and took him back to the apartment. This was the first time Robert and defendant met. During the drive back to the apartment, Lisa brought up the alleged rape. She said that Pugh "shouldn't get away with that. And Mario agreed with it." Defendant showed them a gun. He said that it was "a .22." Lisa told defendant that Pugh had a big house and money. Later that evening, defendant asked Robert to take him to go rob Pugh. Robert had been to Pugh's house once before and so he knew where it was located. He agreed and drove defendant to Pugh's street and dropped him off. Lisa did not accompany them. On the way to Pugh's house, defendant showed Robert a pair of latex gloves and told Robert that Lisa had given them to him. Defendant was wearing a dark blue hat that looked like the hat that was found in Pugh's house after the murder and a flannel shirt over a white T-shirt. Robert dropped defendant off near Pugh's house and immediately drove back to the apartment. Defendant unexpectedly returned to the apartment sometime after dark. He had blood on his arms and chest. He was no longer wearing the flannel shirt or the hat. Defendant asked if he could take a shower; Robert agreed and defendant was given a clean T-shirt. Robert and defendant went outside. Defendant told him that on the way out from Pugh's house, they had struggled for the gun and it went off. He did not tell Robert whether he had taken anything from Pugh. Defendant then tattooed everyone. Later that night, Lisa,

defendant and Robert went out in Robert's truck to purchase some drugs.

Lisa testified that after the girls moved into the apartment they told her that Pugh had raped them. The girls later clarified that "[t]hey had a three-some, that they didn't get paid for it." She told the girls not to tell "anybody that I knew. I didn't specifically say Mario." She possessed latex gloves in July 1997 because she was working as a home health care aide. It is possible that she gave defendant a pair of gloves on the night that he tattooed everyone, which occurred on an unspecified day prior to Pugh's murder. Robert and she picked defendant up on the evening Pugh was murdered. At one point that evening Robert and defendant left together. Robert later told her that defendant had shot Pugh. After the girls watched news coverage of the murder, they said that they did not think defendant "would really go through with it." She denied threatening the girls but admitted that she told them she would beat them up if "they got any of my friends involved." She denied telling Detective McBride that defendant had killed Pugh or that defendant had a gun. She never saw defendant with a gun.

Valerie testified that she told Juan that Pugh forced them to have sex with him. She later told Lisa that she had agreed to the encounter. Robert and Lisa introduced her to defendant. She saw him on three occasions. She met him on July 2 or July 3 when he came to the apartment to tattoo everyone. During this visit defendant asked them, "[D]id he rape you and do you guys want him dead[?]" Valerie testified that she did not reply and that Karina said "yes." She never agreed with the defendant that he should kill Pugh. Defendant returned a few days later. Robert was not home. Defendant brought a gun and said that this was what he was going to use to kill Pugh. He said it was "a .22." Defendant shot through a fence in front of the apartment. He told the girls that he was going to rob and kill Pugh because Pugh had raped them. Some time before Pugh was killed, the girls told defendant that Pugh had "a house and a pool" and "nice things." Valerie did not actually see defendant on the day of Pugh's death. However, she remembers that the telephone rang. Karina answered it. Afterwards, Karina told her that defendant wanted them to meet him at the store. Valerie agreed to go to the store in order to tell defendant not to kill Pugh. Karina, Gilbert and she left to walk to the store. Gilbert did not know "everything that [she] knew about what was going to happen." After the ambulance passed by them, they told Gilbert that defendant had killed Pugh. Karina telephoned Pugh's house. They eventually returned to the apartment. Robert and Lisa were there. Lisa told them that defendant had come back to the apartment covered in blood and had taken a shower. Valerie saw defendant a final time a few days later. He gave Karina and her $20 each. He said that "if we ever told, that we would end up getting 25 years or whatever." She had lied to Detective McBride when she was interviewed in 1997 because Lisa had threatened to beat her up or kill her if she "told on Mario."

Karina testified that she first met defendant on the day before the murder when he came over to tattoo everyone. She does not remember defendant asking if they wanted him to kill Pugh during this meeting. Defendant came over on the day of the murder when Robert and Lisa were not home. He brought a gun and shot it into a fence. He said that this was the gun he was going to use to kill Rod. He was wearing a plain dark blue or black cap. Robert never wore a cap. Later that evening, she saw defendant and Robert leave together. They did not tell her where they were going. However, Valerie told her that "Mario was going over to kill Rod." Defendant telephoned her later and said that he wanted them to be "[a]t Rod's house." They left the apartment and started walking to meet defendant. After they saw the ambulance, they decided not to go to Pugh's house. Instead, they got a ride from "some guy," went to a store and then returned to the apartment. Defendant came back to the apartment later that evening and then Robert took him home. Defendant returned the next day. He gave Valerie and her $20 each. He told her that he had gotten it from Pugh. He did not say that he got the money from a wallet. Defendant also told them that "if she talked about it she could get 25 to life." Defendant telephoned her the next night. He told her that he got into the house and had waited there. Pugh came home. They fought for the gun and he shot Pugh. Defendant

contacted Karina a final time and she met him at school. He told her "he was leaving so he wouldn't get caught for this."

### IV. Trial - defense evidence

Juan Castilleja testified that he saw defendant about one to two weeks before Pugh's murder. Defendant came to the apartment to tattoo everyone. Defendant was not wearing a hat. A day or two before this event, the girls had told him that Pugh had raped them. He told Robert. Robert looked surprised and went to talk to the girls. Juan did not hear their conversation.

See Exhibit A, Motion.

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

### II. Legal Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

### III. Review of Petitioner's Claims

#### A. Ground One

In his first ground for relief, Petitioner claims the trial court committed constitutional error in restricting his ability to impeach Robert Castilleja with a prior misdemeanor spousal abuse conviction. During Petitioner's trial, the trial court ruled in limine that Petitioner was required to prove Robert's prior conviction by independent evidence and not through Robert's own testimony.

This claim was first presented on direct appeal to the 5th DCA. On May 24, 2002, the 5th DCA denied the claim in a reasoned opinion. See Exhibit A, Motion. On June 24, 2002, Petitioner filed a petition for review with the California Supreme Court. See Exhibit B, Motion. The petition was summarily denied on August 14, 2002. See Exhibit C, Motion. The California Supreme Court, by its "silent order" denying review of the 5th DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the 5th DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In reviewing Petitioner's claim, the appellate court stated:

Defendant contends that this ruling was erroneous. Respondent concedes the error but argues that it was harmless. We agree with respondent.

Robert's personal concession that he had suffered the misdemeanor conviction would have been competent evidence and the trial court erred by ruling otherwise.

However, defendant was not prejudiced. The trial court did not completely preclude

> defendant from impeaching Robert with the prior conviction. Nothing prevented defense counsel from establishing the prior conviction through evidence independent of Robert's testimony. More importantly, knowledge of the prior conviction would not have added significantly to the jury's assessment of Robert's credibility. The jury was apprised of information much more damaging to Robert's credibility than a decade-old misdemeanor conviction. The jury learned that Robert had willingly driven defendant to Pugh's house to perpetrate a felony and that he had pled guilty to manslaughter as a result of his involvement in the murder. They also learned that Robert was a drug user and that he lied to the police when he was first contacted. All of this information was more damaging to Robert's credibility than the misdemeanor conviction. Accordingly, we find the erroneous restriction to be harmless.

See Exhibit A, Motion (internal citations omitted).

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"); Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir.1990), *cert. denied*, 498 U.S. 1091 (1991) ("incorrect" evidentiary rulings are not the basis for federal habeas relief); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985). "Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." Bockting v. Bayer, 399 F.3d 1010, 1038 (9th Cir. 2005), *citing* Whelchel v. Washington, 232 F.3d 1197, 1211 (9th Cir. 2000).

In determining whether a restriction on a defendant's opportunity to impeach a witness violates the Confrontation Clause of the Sixth Amendment, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986). "Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts." Id. "These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id.

In this case, the appellate court acknowledged it was error for the trial court to exclude the evidence of Robert's misdemeanor conviction. However, the appellate court found the error was harmless. This determination was not unreasonable in light of the evidence that was admitted. Standing alone, a misdemeanor conviction for spousal abuse would likely have damaged Robert's credibility. However, any damage this evidence could have caused pales in comparison to the evidence of Robert's background that was admitted. As discussed by the appellate court, the jury was presented with evidence that Robert had personally driven Petitioner to the victim's house to commit a felony. (RT[4] 119, 140-141, 145.)  In addition, the jury was presented with the fact that Robert had pleaded guilty to manslaughter for his involvement in the murder. (RT 110-111.) The jury also learned that Robert was a drug user and had lied to police when he was first contacted about the murder. (RT 126, 128, 133, 150-151.) In light of the very damaging evidence that was admitted and presented to the jury, it is certain the admission of Robert's decade-old misdemeanor conviction would have had no additional effect on the jury. Therefore, the erroneous exclusion of this evidence was harmless and does not rise to the level of a constitutional violation.

The rejection of this claim by the state courts was neither contrary to or an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim should be denied.

**B.  Ground Two**

In his second ground for relief, Petitioner claims the felony murder special circumstance[5] is unconstitutionally overbroad. He asserts California's statutory scheme makes no meaningful distinction between felony murders which render a homicide a first degree murder and felony murder

---

[4]"RT" refers to the Reporter's Transcript on Appeal lodged by Respondent with his answer.

[5]The robbery special circumstance is set forth in Cal. Penal Code § 190.2(a) as follows:

The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true:
. . .
(17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies: (A) Robbery in violation of Section 211 or 212.5. . . .

1  subjecting a defendant to special circumstance treatment and the penalty of life in prison without
2  parole or death. He claims this lack of distinction leaves room for arbitrary and capricious imposition
3  of capital punishment in violation of due process and the Eighth Amendment.

4       This claim was also first presented on direct appeal to the 5th DCA, which denied the claim
5  on May 24, 2002. See Exhibit A, Motion. Petitioner then raised it in his petition for review with the
6  California Supreme Court, but the petition was summarily denied on August 14, 2002. See Exhibit
7  C, Motion. By its "silent order" denying review of the 5th DCA's decision, the California Supreme
8  Court is presumed to have denied the claims presented for the same reasons stated in the opinion of
9  the 5th DCA. Ylst, 501 U.S. at 803.

10       The 5th DCA rejected this claim on the merits, stating: "[T]his challenge was rejected by our
11  Supreme Court in *People v. Kraft* (2000) 23 Cal.4th 978 at pages 1078 to 1079, and as a court of
12  inferior jurisdiction, we are bound to follow this ruling. (*Auto Equity Sales, Inc. v. Superior Court*
13  (1962) 57 Cal.2d 450, 455.)." In Kraft, the California Supreme Court cited correct controlling United
14  Supreme Court precedent in Zant v. Stephens, 462 U.S. 862, 877 (1983) and Tison v. Arizona, 481
15  U.S. 137, 158 (1987). Thus, the question is whether the correct controlling authority was applied
16  unreasonably in this case.

17       As stated by Respondent, the Supreme Court has stated that, to be eligible for the death
18  penalty, the aggravating circumstance must meet two requirements. Tuilaepa v. California, 512 U.S.
19  967, 972 (1994). "First, the circumstance may not apply to every defendant convicted of a murder; it
20  must apply only to a subclass of defendants convicted of murder." Id., *citing* Arave v. Creech, 507
21  U.S. 463, 474 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance
22  applies to every defendant eligible for the death penalty, the circumstance is constitutionally
23  infirm"). "Second, the aggravating circumstance may not be unconstitutionally vague." Id., *citing*
24  Godfrey v. Georgia, 446 U.S. 420, 428 (1980) *and* Arave, 507 U.S., at 471 (court " 'must first
25  determine whether the statutory language defining the circumstance is itself too vague to provide any
26  guidance to the sentencer' "), *quoting* Walton v. Arizona, 497 U.S. 639, 654 (1990).

27       Here, the special circumstance does not apply to all defendants convicted of murder. By
28  definition, the special circumstance applies only to those convicted of murder in furtherance of a

1  robbery. Further, the statute is not unconstitutionally vague. The finder of fact was directed toward a
2  specific subject matter for consideration. Tuilaepa, 512 U.S. at 974. A true finding of this special
3  circumstance entails a common sense determination whether the elements of robbery have been met.
4  Thus, the robbery special circumstance is not facially unconstitutional.

5  　　　　Given Petitioner's own culpability, the special circumstance is not unconstitutional as applied
6  to him. Petitioner was a major participant in the crime, having actually committed the murder and
7  robbery. In addition, the jury found Petitioner killed the victim with deliberation and premeditation.
8  Thus, Petitioner's culpability for the crime is more than sufficient to satisfy constitutional
9  requirements. Tison, 481 U.S. at 158 (Supreme Court held "that major participation in the felony
10 committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund*
11 culpability requirement"); Enmund v. Florida, 458 U.S. 782 (1982) (Supreme Court again
12 recognized the importance of mental state, explicitly permitting the death penalty in at least those
13 cases where the felony murderer intended to kill and forbidding it in the case of a minor actor not
14 shown to have had any culpable mental state.).

15 　　　　The state court denial of this claim was neither contrary to or an unreasonable application of
16 clearly established Federal law. See 28 U.S.C. § 2254(d). Therefore, the claim should be denied.

17 　　　　With respect to Petitioner's motion for evidentiary hearing, the Court finds such a hearing
18 unnecessary. As discussed above, the existing state court record is more than sufficient to resolve
19 Petitioner's claims. Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir.1999); Totten v. Merkle, 137
20 F.3d 1172, 1176 (9th Cir.1998); Villafuerte v. Stewart, 111 F.3d 616, 633 (9th Cir.1997) (A
21 petitioner's request to have a federal court hear the same evidence heard by the state court in the state
22 habeas proceeding is not a valid reason for an evidentiary hearing.); Campbell v. Wood, 18 F.3d 662,
23 679 (9th Cir.1994) (An evidentiary hearing is not required on issues that can be resolved by
24 reference to the state court record.).

25 **ORDER**

26 　　　　Accordingly, IT IS HEREBY ORDERED that Petitioner's motion for evidentiary hearing is
27 DENIED.

28

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **May 1, 2007**                    /s/ **Dennis L. Beck**
                                              UNITED STATES MAGISTRATE JUDGE